**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| CELACARE TECHNOLOGIES, INC. )<br><br>Plaintiff, )<br><br>v. )<br><br>CIRCLE INTERNET FINANCIAL, )<br>LLC, )<br><br>Defendant. ) | Case No. 1:24-cv-12322-RGS<br>Jury Trial Demanded |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF CONTENTS ......................................................................................... i

TABLE OF AUTHORITIES................................................................................... ii

PRELIMINARY STATEMENT ............................................................................. 1

FACTS....................................................................................................................... 2

ARGUMENT............................................................................................................. 3

I.     THE STRUCTURE OF ARTICLES 3, 8, AND 12 ....................................... 4

II.    USDC ARE SECURITIES CERTIFICATES.............................................. 7

       A.    USDC Are Securities for UCC Article 8 Purposes ................................ 7

             1.    USDC Are an Obligation of Circle Because They Give
                   Holders a "Right to Redeem" and Say Circle "Commits" to
                   Pay Money ................................................................................. 8

             2.    USDC Are Divisible Because There Are at Least 34
                   Billion Fungible USDC ............................................................. 9

             3.    USDC Are "Traded on Securities Exchanges" Because
                   They Trade on Self-Described "Securities Intermediaries" ......... 9

       B.    USDC Are Certificated Because They Can Be "Possessed" in
             Circle's Own Description and Because the Market Treats Them
             as Certificates ..................................................................................... 10

III.   CELACARE IS ENTITLED TO HAVE CIRCLE RETURN ITS MONEY
       OR REISSUE TOKENS ................................................................................ 13

       A.    Celacare Lost or Destroyed One Million USDC ................................... 13

       B.    Celacare Adequately Pleads That It Will Post a Bond ........................ 15

       C.    No Matter What Else Is True, Circle Is Not Permitted to Take
             One Million Dollars for Nothing .......................................................... 16

CONCLUSION ....................................................................................................... 20

# TABLE OF AUTHORITIES

## Cases

*Allegaert v. Chem. Bank*, 657 F.2d 495 (2d Cir. 1980) .................................................. 9

*Fitzgerald v. Codex Corp.*, 882 F.2d 586 (1st Cir. 1989)............................................. 17

*Garfield v. Allen*, 277 A.3d 296 (2022) .................................................. 16, 19

*GlobalTranz Enterprises, Inc. v. PNC Bank, N.A.*, No. CV N19C-09-144 MAA, 2020 WL 3469114 (Del. Super. Ct. June 25, 2020) .......................................................... 19

*Highland Cap. Mgmt. LP v. Schneider*, 866 N.E.2d 1020 (N.Y. 2007)............. 5, 7, 11

*Invs. Bank v. Torres*, 233 A.3d 424 (N.J. 2020) ....................................................... 6, 7

*Jelmoli Holding, Inc. v. Raymond James Fin. Servs., Inc.*, 470 F.3d 14 (1st Cir. 2006) ....................................................................................................................... 16

*Jones v. Ward*, 270 A.3d 1024 (Md. Ct. App. 2022) ............................................... 6, 13

*Mergenthaler v. Enzolytics, Inc.*, No. 21-cv-1163, 2022 WL 3444949 (D. Del. Aug. 17, 2022) ....................................................................................................................... 15

*Moore v. Armed Forces Bank, N.A.*, 534 S.W.3d 323 (Mo. Ct. App. 2017)................ 15

*Petróleos de Venezuela, S.A. v. PDV Holding, Inc.*, 306 A.3d 572 (Del. Ch. 2023).... 15

*SEC v. Coinbase, Inc.*, 2024 WL 1304037 (S.D.N.Y. Mar. 27, 2024) ..................... 3, 10

*Secure Our City, Inc. v. ECI Sys., LLC*, 594 F. Supp. 3d 96 (D. Mass. 2022) ........... 16

*Tolliver v. Christina Sch. Dist.*, 564 F. Supp. 2d 312 (D. Del. 2008) ........................ 18

## Statutes

6 Del. Code § 1-103 ...................................................................................................... 4

6 Del. Code § 1-201(b)(43) .......................................................................................... 11

6 Del. Code § 12-102 ..................................................................................................... 5

6 Del. Code § 3-203 ..................................................................................................... 13

6 Del. Code § 8-102(15)(a)(iii)(A) ................................................................................ 9

6 Del. Code § 8-102(15)(a)(iii)(B) ................................................................................ 9

6 Del. Code § 8-102(a)(15) ..................................................................... 7

6 Del. Code § 8-405 .....................................................................passim

6 Del. Code §§ 8-501 ..................................................................... 5

6 Del. Code 8-102(a)(16) ..................................................................... 10

## Other Authorities

Adam J. Levitin, *Not Your Keys, Not Your Coins: Unpriced Credit Risk in Cryptocurrency*, 101 TEX. L. REV. 877 (2022) ........................................... 5

BLACK'S LAW DICTIONARY, *Certificate* ........................................... 10

BLACK'S LAW DICTIONARY, *Lost* ..................................................... 14

BLACK'S LAW DICTIONARY, *Destroy* ................................................ 14

BLACK'S LAW DICTIONARY, *Document* .............................................. 10

D.T. Max, *Half a Billion in Bitcoin, Lost in the Dump*, NEW YORKER, Dec. 6, 2021 . 2, 11

DELOITTE, *Independent Accountants' Report to Circle Internet Financial*, Sept. 27, 2024 ........................................................................................ 2, 3

Edward J. Janger, *The Costs of Liquidity Enhancement: Transparency Cost, Risk Alteration, and Coordination Problems*, 4 BROOK. J. CORP. FIN. & COM. L. 39 (2009) ........................................................................................ 6

Jeanne L. Schroeder, *Bitcoin and the Uniform Commercial Code*, 24 U. MIAMI BUS. L. REV. 1 (2016) ............................................................................ 5

RESTATEMENT (SECOND) OF CONTRACTS § 76 ........................................ 18

UCC § 8-102, Official Cmt. 15 ............................................................ 9

UCC Art. 12, Refs. & Ann., Official Cmt. ............................................ 5

## PRELIMINARY STATEMENT

For every U.S. Dollar Coin ("USDC") in circulation, Defendant Circle Internet Financial LLC holds one U.S. dollar in cash or its equivalent. Ex. A at 1–2. Circle promises every holder of USDC the "right to redeem" each coin for a dollar. *Id.* at 2. Plaintiff Celacare Technologies, Inc., held one million USDC, which is destroyed, and has sued Circle to re-issue the USDC or redeem it. *Id.* Circle moves to dismiss, arguing that USDC generate *no obligations* and that it has not been enriched.

Both contentions are wrong, and the motion to dismiss should be denied. Each fungible USDC represents Circle's "commit[ment]" to pay a dollar to the person who "possess[es]" the coin. *Id.* Because the coins trade on platforms that explicitly call themselves "securities intermediaries," USDC are "securities certificates" under Article 8 of the Uniform Commercial Code ("UCC"), and Circle must replace them under Section 8-405(a). And granting Circle's motion to dismiss would necessarily give it an unjustified windfall: because the Complaint alleges that Celacare's million USDC have been destroyed—an allegation that must be taken as true for purposes of this motion to dismiss—Circle is a million dollars richer today than it was before Celacare destroyed the million USDC. Indeed, on Circle's reading of the contract with its customers, its "commit[ment]" to back USDC with real dollar reserves somehow allows it to refuse to pay anyone holding USDC and to keep more than $34 *billion* in customer money forever, in exchange for *nothing*. The UCC, equity, and a fair reading of the terms of service do not permit this. This Court should thus deny Circle's motion and reject its invitation to create bespoke exceptions to commercial law allowing crypto companies to wrongfully keep customer funds.

## FACTS

Circle is a Boston-based company that issues USDC on the Ethereum blockchain. Compl., (ECF No. 1) ¶¶ 5, 16–17. USDC represent Circle's "commit[ment] to redeem 1 USDC for 1 USD" subject to terms and conditions, fees, and applicable laws. ECF No. 1-1, Ex. A at 3. More than 34 billion USDC circulate worldwide as reliable dollar substitutes for use in crypto transactions. Compl. ¶ 27.

USDC are issued as Ethereum smart contracts. *Id.* ¶¶ 14. Any person with an Ethereum wallet address may transact in USDC using a private key. *Id.* ¶ 15. When Circle created the USDC smart contract, it gave itself the power to authenticate a USDC, *id.* ¶ 19, and it gave itself the power to permanently freeze a USDC, *id.* ¶ 45. Circle treats frozen USDC as removed from circulation and, therefore, removed from its obligation to maintain adequate reserves, and it can issue as many USDC as it wants. *See, e.g.*, DELOITTE, *Independent Accountants' Report to Circle Internet Financial*, Sept. 27, 2024 ("USDC In Circulation is defined as the total USDC supply . . . less . . . Access Denied Tokens."), *available at* https://perma.cc/A5SN-CUKU.

Trading on Ethereum is complicated and technical. To access a blockchain address, a user needs a private key. Compl. ¶¶ 13–15. When users lose the private key to a blockchain address, they permanently lose the ability to transact. *See, e.g.*, D.T. Max, *Half a Billion in Bitcoin, Lost in the Dump*, NEW YORKER, Dec. 6, 2021 (detailing the travails of a man who lost the private keys to a crypto wallet). For this reason, most retail crypto users rely on centralized exchanges like Coinbase to trade crypto assets. Coinbase holds crypto assets on its users' behalf and allows them to trade with each other on Coinbase's books (meaning that the transactions are not

recorded on the blockchain) or to withdraw their crypto assets to a wallet address of their choosing. *Id.* ¶ 30; Ex. C ¶ 4.4 (Coinbase terms of service). Coinbase explicitly describes itself as a "securities intermediary" and declares that users' accounts are "securities accounts" and that the assets in them are governed by Article 8 of the UCC. *Id.* ¶ 2.7.2. Coinbase is also a securities exchange under federal law because other tokens that trade on its books are securities under federal law. *See, e.g.*, *SEC v. Coinbase, Inc.*, 2024 WL 1304037, at *1 (S.D.N.Y. Mar. 27, 2024).

In May 2024, Celacare opened an institutional securities account at Coinbase. Compl. ¶ 37. On July 3, Celacare transferred $1 million U.S. dollars to Coinbase with instructions to credit its account with one million USDC. *Id.* ¶ 38. Later that same day, Celacare accidentally sent the one million USDC to a wallet address that is one digit off from the intended address. *Id.* ¶ 39.[1] Because of the cryptography underlying the Ethereum blockchain, which Circle does not and cannot dispute, no one will ever be able to access those USDC again. *Id.* ¶ 43. They have been permanently destroyed, and Circle is empowered to freeze those coins and thus, by its own account, remove them from circulation permanently. *See* Compl. ¶¶ 42–52; *see also* DELOITTE, *supra*.

## ARGUMENT

Celacare has plausibly alleged that it was the rightful possessor of one million USDC tokens that have been permanently destroyed. Assuming the truth of those

---

[1] Circle contends that "Celacare did not make the test transfer recommended by Coinbase." Mot. to Dismiss, ECF No. 13 at 5. This is legally irrelevant, but it is also false: The test transaction went to the correct address. *See* Hash No. 0xcffeb79b5f2be8b0644c25395696666acfc1e1efc1bd3f5201b5e4f60b88e59c, *available at* etherscan.io.

allegations, Celacare is entitled under the UCC to have Circle replace the one million USDC. Circle instead seeks a windfall as a result of the tokens' permanent destruction that equity will not allow. This memorandum first summarizes the relevant UCC provisions then explains why USDC are securities certificates, the UCC requires that Circle replace them, and equity requires that Circle pay over its unjustly acquired gains.

## I.   THE STRUCTURE OF ARTICLES 3, 8, AND 12

Under the Delaware version of the UCC, which governs the commercial claims in this case pursuant to Circle's terms, Ex. A ¶ 31, the "Code must be liberally construed and applied to promote its underlying purposes and policies," among them "[t]o simplify, clarify, and modernize the law governing commercial transactions," and "[t]o permit the continued expansion of commercial practices through custom, usage, and agreement of the parties." 6 Del. Code § 1-103. As relevant here, Article 3 of the UCC governs "negotiable instruments," such as notes and drafts (including checks); Article 8 governs "financial assets," including securities; and newly promulgated Article 12 governs "controllable electronic records." A negotiable instrument is a "financial asset" governed by Article 8 if it is held in a "securities account," § 8-103(d), and a "controllable electronic record" is a "financial asset" where, as here, parties elect to treat it as such, § 8-103(h) (citing § 8-102(a)(9)(iii)). Article 8, therefore, is the key governing provision here.[2]

---

[2] For the reasons described below, USDC are securities certificates. This Court therefore need not reach Celacare's alternative argument that they are negotiable instruments, and this claim may be dismissed without prejudice.

Article 8 was created to solve the "paper crunch" that arose in the 1960s and made physical transfers of certificates unworkable. *E.g.*, Jeanne L. Schroeder, *Bitcoin and the Uniform Commercial Code*, 24 U. MIAMI BUS. L. REV. 1, 46 (2016), *cited in* MTD at 14. The Code solved this problem by creating the "indirect holding" regime and with it a novel category of property: the "securities entitlement." *E.g.*, 6 Del. Code §§ 8-501–11. Owners could now contract with brokers for entitlements to securities that were held beneficially for them by the brokers, *id.* § 8-503, and traded on instructions, *id.* § 8-506. Trades generally settle on brokers' books. Schroeder*, supra.*

Parties may choose to opt-in to Article 8's regime for assets that would not otherwise be securities, *id.* § 8-102(9)(iii), and some crypto exchanges do, usually to assure the market that the exchange's customers' assets are customer property in the event of an exchange bankruptcy. *E.g.*, Adam J. Levitin, *Not Your Keys, Not Your Coins: Unpriced Credit Risk in Cryptocurrency*, 101 TEX. L. REV. 877 (2022) (explaining customer risk in bankruptcy under prior version of Coinbase terms that did not elect Article 8 treatment). Article 8's definitions were "deliberately worded by the drafters 'in general terms, because they must be sufficiently comprehensive and flexible to cover the wide variety of investment products that now exist or may develop.'" *Highland Cap. Mgmt. LP v. Schneider*, 866 N.E.2d 1020, 1025 (N.Y. 2007).

One such development is reflected in the new UCC Article 12, adopted by Delaware in 2022. *See* 6 Del. Code § 12-102. Article 12 was adopted because "people are using the creation or transfer of electronic records to transfer rights to receive payment [and] rights to receive performance of other obligations," UCC Art. 12, Refs.

& Ann., Official Cmt., and this creates risk that there will be "disputes among claimants to electronic records and their related rights and other benefits," *id*. Article 12 endeavors to "reduce these risks" by creating another new category of property: the "controllable electronic record" (CER). *Id*. A CER is an electronic record that can be "controlled." "In this context," the UCC drafters made explained, "it may be useful to think of control as the functional analogue of possession of tangible personal property such as goods." *Id*.

Article 8 requires securities issuers to replace certificates when they are lost, stolen, or destroyed. *See, e.g.*, 6 Del. Code § 8-405. This rule exists for at least two reasons. First, it prevents the "windfall" that would occur if the obligor on a lost asset were rendered free of liability merely because the asset has been destroyed or misplaced. *See, e.g.*, *Jones v. Ward*, 270 A.3d 1024, 1036 (Md. Ct. App. 2022) ("[I]f we were to construe § 3-309 as [defendant] suggests, the result would confer a windfall on debtors where a lost or destroyed note was purchased."); *Invs. Bank v. Torres*, 233 A.3d 424, 437 (N.J. 2020). Second, the rule straightforwardly promotes the marketability of securities. Article 8 aims to enhance the liquidity of financial obligations by making these obligations "negotiable," such that delivery of appropriately indorsed instruments constitutes transfer of the financial obligations recorded in the instruments. *See* Edward J. Janger, *The Costs of Liquidity Enhancement: Transparency Cost, Risk Alteration, and Coordination Problems*, 4 BROOK. J. CORP. FIN. & COM. L. 39 (2009). Negotiability requires that the obligations be "reified" in the instrument itself, *id*., but this also means that if the instrument

were lost or destroyed, the erstwhile holder of the instrument would lose all rights to the embodied financial obligation. Without Article 8's replacement rule, parties would need to take wastefully excessive precautions lest they lose all their value. *See Invs. Bank*, 233 A.3d at 437 (explaining that contrary interpretation could risk many assets at once). Section 8-405 facilitates the liquidity of financial obligations by enabling holders to avoid excessive security precautions.

## II.   USDC ARE SECURITIES CERTIFICATES

Section 8-405(a) of the Code requires the issuer of a "certificated security" to reissue a new certificate if the owner claims that the original one has been lost or destroyed and posts indemnity. This provision requires that a "security" under the Article 8 definition be in "certificated" form. USDC meet these requirements.

### A.   USDC Are Securities for UCC Article 8 Purposes

USDC is a "security" for the purposes of UCC Article 8. To be a "security" under Article 8, an asset must be an "obligation of an issuer"

> (i) which is represented by a security certificate in bearer or registered form, . . .;
>
> (ii) which is one of a class or series or by its terms is divisible into a class or series of shares, participations, interests, or obligations; and (iii) which:
>
> (A) is, or is of a type, dealt in or traded on securities exchanges or securities markets; or
>
> (B) is a medium for investment and by its terms expressly provides that it is a security governed by this Article.

6 Del. Code § 8-102(a)(15). In other words, an asset that is an "obligation of an issuer" under section 8-102(a)(15) "must [also] fulfill the requirements of

subparagraphs (i) (the transferability test), (ii) (the divisibility test), and (iii) (the functional test)." *Highland Cap. Mgmt.*, 866 N.E.2d at 1024.

### 1.   *USDC Are an Obligation of Circle Because They Give Holders a "Right to Redeem" and Say Circle "Commits" to Pay Money*

Circle argues that USDC are not securities certificates because "Circle never promised . . . that . . . USDC would be *redeemed*," MTD at 8 (emphasis in original), only that that "Circle must *back* the USDC tokens" with adequate cash reserves, MTD at 17 (emphasis added). But Section 8-102(a)(15) requires only that something be an "obligation" to be a security, not that it be an obligation free from *any* conditions, so Circle's reading fails immediately: USDC create financial obligations for Circle.

And Circle's reading of its terms is, to the say the least, creative. Those terms give anyone who holds USDC the "the *right to redeem* USDC for USD funds so long as the Holder is eligible to, and does, register a Circle Mint account." Ex. A at 2 (emphasis added). Registering for a Circle Mint account requires no more than click-wrap agreeing to some boilerplate and complying with know-your-customer rules. *Id.* at 1 (click "Circle Mint Terms"). In those terms, Circle reserves for itself the discretion to deny registration. But Circle cites no authority for the proposition that this negates all of its customers' "right[s] to redeem" *entirely*, such that its "commit[ment]" to "back" USDC actually means *nothing* and Circle is free to keep all the money. Still, Circle somehow claims for itself full and absolute discretion to deny any of its millions of users the right to redeem their money for any reason or no reason, including the most plausible reason: so Circle can run off with their money. Thankfully, that is not a reasonable reading of Circle's terms as a whole, which clearly represent an

8

"obligation," at least conditionally upon complying with the Circle Mint terms, for Circle to pay money.

> ### 2. USDC Are Divisible Because There Are at Least 34 Billion Fungible USDC

The "divisibility" test serves to distinguish securities from "individual obligations of the sort governed by ordinary contract law." UCC § 8-102, Official Cmt. 15. To be "divisible" a financial asset must comply with the "minimum . . . formality that there be at least two instruments in a specified class or series." *Allegaert v. Chem. Bank*, 657 F.2d 495, 507 (2d Cir. 1980). Here, the one million USDC Celacare lost were among more than 34 billion identical and fungible USDC. That is surely more than two. "The fact [this] element is satisfied is so obvious that it does not warrant discussion." *Id.*

> ### 3. USDC Are "Traded on Securities Exchanges" Because They Trade on Self-Described "Securities Intermediaries"

The UCC's "functional" test "provides flexibility while ensuring that the Article 8 rules do not apply to interests or obligations in circumstances so unconnected with the securities markets that parties are unlikely to have thought of the possibility that Article 8 might apply." UCC § 8-102, Official Cmt. 15. A financial asset meets the functional test if it "is, or is of a type, dealt in or traded on securities exchanges or securities markets." 6 Del. Code § 8-102(15)(a)(iii)(A).[3]

---

[3] The UCC alternatively provides that a financial asset meets the functional test if it is a "medium for investment" and expressly invokes Article 8, 6 Del. Code § 8-102(15)(a)(iii)(B). Celacare does not contend that USDC meets subparagraph (B)'s "express invocation" test. Accordingly, it is irrelevant that Circle claims that the test is not met because people (supposedly) do not use USDC for investment. *See* MTD at 12–13. Likewise, Circle's argument that USDC does not meet the federal definition of "security" is irrelevant

USDC trade on securities exchanges such as Coinbase and therefore meet the "functional" test. The Coinbase exchange is a "securities intermediary" by its own description. And it, Circle, and all Coinbase's customers, including Celacare, explicitly agreed to treat assets traded on Coinbase as "securities" for purposes of UCC Article 8. Ex. D ¶ 2.7.2; Compl. ¶ 36. Although this agreement is alone easily sufficient to meet the functional test, Coinbase is *also* a federal securities exchange. *Coinbase*, 2024 WL 1304037, at *1. In response to all this, Circle simply asserts that "USDC is not . . . traded on securities exchanges or . . . markets." MTD at 11. Putting the word "not" in front of plausible allegations is not an argument for dismissing a complaint, let alone a good argument. USDC are functionally securities.

### B.   USDC Are Certificated Because They Can Be "Possessed" in Circle's Own Description and Because the Market Treats Them as Certificates

Section 8-405(a) applies to "securities certificates." Article 8 defines a "[c]ertificated security" as "a security that is represented by a certificate," and defines a "securities certificate" as "a certificate representing a security." 6 Del. Code 8-102(a)(16). No court has yet addressed whether blockchain tokens like USDC that otherwise meet the definition of "security" for Article 8 purposes are "certificates." MTD at 14. Based on the statute's text and purposes, they are.

Starting with the text: a "securities certificate" is any "certificate" that "represent[s]" a "security." "Certificate" is not limited to paper, but rather can be any

---

for UCC purposes because "[t]he characterization of . . . a transaction for purposes of this Article does not determine the characterization of the . . . transaction for purposes of any other law, regulation, or rule." Del. Code § 8-102(d). *Id.*

"document," and USDC are "documents" because they are "information stored on a computer." *E.g.*, BLACK'S, *Document*; *Certificate*. And the UCC contains a specific definition for "writing," which "includes printing, typewriting, or any other intentional reduction to tangible form." 6 Del. Code § 1-201(b)(43). Even if an electronic document did not fall within the scope of "writing" (which it does), Article 8 does not use the term "writing" when defining "certificate," even though it does use it in other nearby definitions. *E.g.*, *id.* § 8-102(a)(6)(i). This means a "certificate" need not be a "writing," but rather includes anything that, like USDC, documents a certification. And "writing" does not inherently exclude electronic forms, and no case has so held. All blockchain entries, like all electronic documents, *are* reduced to tangible form: a chip or disk encoding information by opening or closing small electric circuits. The Ethereum blockchain is just such an electronic record and an entry on the blockchain can always be held in one's hand. *E.g.*, Max, *supra*.

To the extent there is ambiguity in the definition of "certificated security," though, this Court should be guided by Section 1-301, which instructs courts to take a practical, functional approach to adapting Article 8's language to "cover the wide variety of investment products that now exist or may develop." *Highland Cap. Mgmt.*, 866 N.E.2d at 1023. There is no question that Article 8's drafters in the 1960's could not have imagined Ethereum when they wrote the word "certificate." But the market has changed since then, and the market treats blockchain tokens as though they were possessable, tangible property. Many companies, including Coinbase, offer "custody" services, by which they agree to "h[o]ld assets" for their customers. *E.g.*, Ex. C ¶ 2.7.

11

People go to elaborate lengths to keep their crypto assets physically safe. *E.g.*, Max, *supra*. And, most tellingly, Circle itself purports to honor its redemption obligation only for those who "possess" USDC, just as it would if it issued paper notes. Treating blockchain tokens as certificated securities also furthers the general UCC policy of enhancing the liquidity of financial assets by facilitating their negotiability, including through the application of its rules to protect holders of a lost or destroyed certificates. Because USDC meet the definition of "certificates" and treating them as certificates is consistent with market practice and the purposes of the UCC, USDC are "certificates."

Circle contends that USDC are not "certificates" because "holders of USDC do not possess—or bear—any certificate" and that USDC are, thus, book-entry securities. MTD at 15–16. But in its terms, Circle agrees that redemption for dollars is conditional on "*possession* of a corresponding amount of USDC." Ex. A at 6 (emphasis added). Thus, according to Circle, USDC holders "possess" USDC, just as they would paper certificates. One cannot "possess" a book entry. All of Circle's academic authorities were written before the passage of Article 12, *see* MTD at 14, which created CERs: electronic records that can be "possess[ed]," UCC § 12-102, Official Cmt. 1, and none of those authorities address what is supposed to happen to lost or destroyed records. And Circle points to nothing in the Code saying that a controllable electronic record cannot also be a securities certificate.

### III.   CELACARE IS ENTITLED TO HAVE CIRCLE RETURN ITS MONEY OR REISSUE TOKENS

The UCC requires that the "issuer" of a "certificated security" "issue a new certificate" whenever the owner "claims that the certificate has been lost [or] destroyed" and posts a bond. 6 Del. Code § 8-405. Because Celacare plausibly pleads that the million USDC have been "lost" or "destroyed," and because it stands ready to post a bond, Circle's motion must be denied. And even if the terms of the UCC are not met, equity requires Circle to pay over the "windfall" generated by Celacare's destruction of the coins. *Jones*, 270 A.3d at 1036.

#### A.   Celacare Lost or Destroyed One Million USDC

Celacare sent one million USDC to a wallet address that, by virtue of an error, was chosen at random. Compl. ¶¶ 13–15. Celacare plausibly pleads that because of Ethereum's cryptography, a randomly chosen address can never be accessed. Circle does not, and cannot, dispute this. It instead first contends that Celacare must lose because "Celacare willingly *transferred* the USDC," MTD at 10 (emphasis added), but this ignores the UCC and the complaint: "transfer" means "deliver[y] . . . for the purpose of giving to the person receiving delivery the right to enforce the instrument." 6 Del. Code § 3-203; *see also id.* § 8-301 (defining "delivery" similarly). Celacare did not "transfer" the USDC because Celacare did not deliver the USDC for the purpose of giving the recipient the right to enforce it. Instead, at this stage of litigation, this Court must take as true the fact that Celacare "lost possession other than through a delivery to another person for the purpose of giving that person the right to enforce the redemption rights encoded in the USDC." Compl. ¶¶ 39, 61. Further, it doesn't

13

matter whose fault the destruction was. The UCC does not import a contributory negligence element to its lost-record provisions. *Compare*, 6 Del. Code § 8-405, *with id.* § 3-406 (contributory negligence for forgeries or alterations of instruments).

Next, Circle contends that "[t]he USDC is not destroyed" because it "remains in th[e] wallet" that Celacare "identified in the Complaint." MTD at 15. This argument ignores the plain meanings of "destroy" and "lost," and the purposes of the UCC to boot. Something is "destroyed" when it is "damaged . . . so thoroughly as to make [it] unusable." BLACK'S, *Destroy*. Something is "lost" when it is "beyond the possession and custody of its owner and not locatable by diligent search." BLACK'S, *Lost*. As a matter of well-pleaded fact, the USDC at issue in this case "are permanently inaccessible, can never be moved or redeemed, and so have been destroyed." Compl. ¶ 44. Other than again adding the word "not" before the plausible allegations (and statutory text), MTD at 15, Circle has nothing to say to this. And to the extent there is any ambiguity about the meaning of "destroyed" in the context of Celacare's well-pleaded allegations, this Court should apply the text consistent with its purposes. The Complaint plausibly alleges that USDC at issue here will never be usable by anyone ever again. The mere fact that one could point to the wallet address where they have been rendered permanently inaccessible is like saying a sunken ship is not "lost" at sea merely because one could point to a place on the ocean floor where it lies. *Contra* BLACK'S, *Lost* (explaining "lost" in context of "lost at sea"). The ship is never coming back, and neither are the USDC.

## B.      Celacare Adequately Pleads That It Will Post a Bond

The UCC requires that the owner of a lost securities certificate "file[] with the issuer a sufficient indemnity bond" and "satisfy other reasonable requirements imposed by the issuer" to be entitled to a replaced certificate. 6 Del. Code § 8-405(a)(2), (3). Celacare pleaded in the Complaint that "Circle is therefore required under Section 8-405(a) of the UCC to reissue the USDC to Celacare *contingent on Celacare posting an appropriate indemnity bond*." Compl. ¶ 82 (emphasis added). Celacare stands willing to post a bond at the conclusion of this case, *id*., and argues that a nominal bond is sufficient because Circle has no risk of liability, *id*. ¶ 83.

Under clear Delaware law, claimants need not have *already posted* a bond when they file a complaint to state a claim. That is because the amount and form of a bond are determined by the "circumstances presented" in a case, which have not yet been proven when it is filed. *Petróleos de Venezuela, S.A. v. PDV Holding, Inc.*, 306 A.3d 572, 584 (Del. Ch. 2023). Circle's citations to the contrary are not like this case: they address circumstances where claimants have not justified the waiver or reduction of a bond or where they failed to plead willingness to post one; none requires claimants to post a bond before filing a civil case, one of the purposes of which *is to determine the amount of the bond. E.g.*, MTD 15 (citing *Mergenthaler v. Enzolytics, Inc.*, No. 21-cv-1163, 2022 WL 3444949, at *4 (D. Del. Aug. 17, 2022) ("I find that Plaintiff should not be excused from filing an indemnity bond.")); *Moore v. Armed Forces Bank, N.A.*, 534 S.W.3d 323, 327 (Mo. Ct. App. 2017) (faulting plaintiffs for failing "to *plead* the bond element" of the claim and noting that bond is required for

relief, not to state a claim)). If Celacare prevails, Celacare will post an adequate bond before Circle is ordered to produce new USDC. That is sufficient at this point.

## C.   No Matter What Else Is True, Circle Is Not Permitted to Take One Million Dollars for Nothing

Finally, if the Court concludes that the UCC does not apply here, the motion to dismiss should be denied as to count three, the claim for equitable relief. That is because whether denominated as "money had and received" or "unjust enrichment," Circle must replace or redeem the destroyed coins because it would receive an unjust windfall otherwise.

"Money had and received is based on money, or its equivalent, which in equity and good conscience should be returned to the claimant and is often styled as money that should be returned where one is unjustly enriched at another's expense." *Jelmoli Holding, Inc. v. Raymond James Fin. Servs., Inc.*, 470 F.3d 14, 17 n.2 (1st Cir. 2006) (cleaned up). "Unjust enrichment" is a materially identical claim. *Secure Our City, Inc. v. ECI Sys., LLC*, 594 F. Supp. 3d 96, 106 (D. Mass. 2022). To state a claim, the plaintiff must plead (1) an enrichment, (2) an impoverishment, (3) a relationship between them, (4) absence of justification, and (5) absence of remedy at law. *E.g.*, *Garfield v. Allen*, 277 A.3d 296, 341 (2022). Here, when Celacare destroyed the coins that Circle claims it must "back," MTD at 17, Circle was immediately enriched by a million dollars, and Celacare was directly impoverished in the same amount. Circle offers no justification whatever for why it should keep this money, instead claiming, by fighting the pleaded facts, that it has not been enriched at all. *Id.* at 16. And (assuming Celacare's alternative claims are not successful) Celacare lacks a remedy

16

at law because the contract between Circle and Celacare neither creates nor bars this claim. Compl. ¶ 89. Celacare has stated a claim for money had and received.

Circle argues first that Count Three should be dismissed because there is no action for money had and received in Delaware. MTD at 16. The Complaint explains that "equity . . . requires one who has and receives money that in good conscience should belong to another to return it," Compl. ¶¶ 84–93, and notes that nothing in Delaware law (which governs the contract between the parties) displaces that rule of equity. *Id.* ¶ 92. The Complaint does not contend that Delaware law governs the *equitable* claims, which fall outside the contract. *Id.* Still, because the only feature of Delaware law to which Circle points that differs from Massachusetts law is the name of the cause of action, this Court need not address the choice-of-law question: The particular label given to the claim in the Complaint is irrelevant  because "it is not necessary that a legal theory be pleaded in the complaint if plaintiff sets forth sufficient factual allegations to state a claim showing that he is entitled to relief under *some* viable legal theory." *Fitzgerald v. Codex Corp.*, 882 F.2d 586, 589 (1st Cir. 1989) (emphasis in original; quotation marks omitted).[4] The parties agree that if Circle has money that does not rightfully belongs to Celacare—and that Celacare therefore states an unjust-enrichment claim—the money must be returned.

Circle instead argues that Celacare's equitable claim fails because it is subsumed in a breach-of-contract claim. MTD at 16. But Celacare has not brought

---

[4] To the extent the Court finds that the "had and received" label of the claim is outdated or incorrect, Plaintiff would respectfully request leave to amend the Complaint.

any breach-of-contract claim against Circle, and nothing in the terms of service *bar* this claim. Compl. ¶ 89. Celacare's only other claims are to enforce specific statutory rights under the UCC, so there is no contract claim to subsume equity.

The equitable claim can go forward here because a "claim of unjust enrichment may survive a motion to dismiss . . . when the validity of the contract is in doubt or uncertain" or "where an express contract exists that does not govern exclusively the obligations or rights of the parties at issue." *Tolliver v. Christina Sch. Dist.*, 564 F. Supp. 2d 312, 315–16 (D. Del. 2008). If Circle has really disavowed its promise to repay to USDC holders the money that it holds on their behalf, that would make the contract illusory and so permit a claim of unjust enrichment to go forward. *E.g.*, RESTATEMENT (SECOND) OF CONTRACTS § 76. And regardless, the contract's terms simply do not let Circle keep the money. Compl. ¶ 89 ("The terms, in other words, do not purport to *create* a loss of U.S. *dollars* when U.S. dollar *coins* are transferred to an erroneous address; they instead address a circumstance where users send USDC to the wrong person, who then acquires the rights to the underlying US dollars."). Circle sold one million USDC for $1 million, which it holds in cash and cash equivalents. If Circle's CEO found a million dollars in a briefcase on the street, the mere fact that no contract requires its return would be no defense to a case for return to the rightful owner, no matter how the briefcase ended up on the street. Circle has no legitimate claim to the funds backing the lost and destroyed USDC, and, as a matter of well-pleaded fact, Circle faces no liability for those USDC. Celacare's allegations on that fact are not "conclusory," *contra* MTD at 17; they are conclusive.

Circle next argues that Celacare did not send the money directly to Circle, and that Circle has therefore "not been enriched by Celacare's transfer." MTD at 16–17. But unjust enrichment does not require a direct transfer from plaintiff to defendant. *Garfield*, 277 A.3d at 344. Instead, the removal of an obligation to pay is an "enrichment." *GlobalTranz Enterprises, Inc. v. PNC Bank, N.A.*, No. CV N19C-09-144 MAA, 2020 WL 3469114, at *4 (Del. Super. Ct. June 25, 2020) (holding, under materially identical California law, that "[a] saved expenditure or a discharged obligation is no less beneficial to the recipient than a direct transfer" (citation omitted)). And Celacare has pleaded that Circle's coins obliging Circle to pay money have been destroyed.

Finally, Circle protests that even if it denied access to the wallet where the destroyed coins are, it would not be protected "against claims by third parties that the USDC in question rightfully belongs to them." MTD at 16. But this misunderstands the procedural posture of this case and contradicts Circle's other arguments. Celacare pleaded that no one has access to that address, Compl. ¶¶ 87, 88, and seeks through this Action a "declaratory judgment that Celacare was the rightful owner of one million USDC on or before July 3, 2024," and "that those coins have been destroyed and therefore that no other person has a claim to them." *Id.* (prayer). If Celacare succeeds at trial, Circle will be conclusively free of liability on those destroyed coins, *id.*, something it cannot, and does not, contest, *see generally* MTD. At this stage, Celacare need only plausibly plead these facts, which Celacare has done.

Regardless, according to Circle, those hypothetical third parties would *have no right to redeem* the coins—Circle says that it "never promised . . . that . . . USDC would be redeemed." MTD at 8. What liability is it worried about, then? If Circle is right about its own terms, it has found a miraculously successful business model: It can sell USDC to the public for a dollar, promising the public that Circle will "back" each coin with a dollar, but then whenever anyone shows up seeking such a dollar Circle can say "tough luck—we never promised that we'd *redeem* your money." Circle identifies exactly zero limits on its ability to do this under its terms of service, and indeed the absence of those limits is essential to Circle's remarkable claim that USDC do not represent *any* "obligation" Circle owes to USDC holders. MTD at 11. Circle cannot have it both ways: Either USDC actually are obligations (and Celacare believes that they are and, therefore, that its Article 8 claims should succeed), or they are not, in which case Circle is holding other people's money in exchange for nothing and its illusory contract does not, and cannot, bar equitable claims.

## CONCLUSION

For the foregoing reasons, Circle's motion to dismiss should be denied.

Dated: November 1, 2024

Respectfully submitted,

*/s/ Charles Gerstein*
Charles Gerstein (*pro hac vice*)
**Gerstein Harrow LLP**
1001 G Street NW, Suite 400E
Washington, DC 20001
charlie@gerstein-harrow.com
(202) 670-4809

*/s/ Jason Harrow*
Jason Harrow (*pro hac vice*)
**Gerstein Harrow LLP**
12100 Wilshire Blvd, Suite 800
Los Angeles, CA 90025
jason@gerstein-harrow.com
(323) 744-5293

*/s/ Joel Fleming*
Joel Fleming (BBO 685285)
Lauren Godles Milgroom (BBO 698743)
**Equity Litigation Group LLP**
101 Arch Street, 8th Floor
Boston, MA 02110
Jfleming@equitylitigation.com
lmilgroom@equitylitigation.com
(617) 468-8602

**CERTIFICATE OF SERVICE**

I hereby certify that on November 1, 2024, I caused this document to be filed through the CM/ECF system, where it will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

*/s/ Charles Gerstein*
Charles Gerstein